TIMPTE, INCORPORATED, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 78–1038.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Oct. 24, 1978.

Decided Jan. 19, 1979.

Rehearing Denied April 4, 1979.

Robert G. Good, of Good & Stettner, P. C., Denver, Colo. (Martin Semple, Denver, Colo., with him on brief), for petitioner.

Christine Peterson, Atty., N.L.R.B., Washington, D. C. (Marjorie S. Gofreed and Christopher W. Katzenbach, Attys., N.L. R.B., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel., Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L. R.B., Washington, D. C., on brief), for respondent.

Before SETH, Chief Judge, BARRETT and DOYLE, Circuit Judges.

SETH, Chief Judge.

This is a petition by Timpte, Incorporated, to review an order of the National Labor Relations Board, with a cross-application by the Board to enforce its order. The matter concerns the discharge of Richard Gould who was an employee of Timpte. The Administrative Law Judge concluded that Timpte had violated section 8(a)(1) of the National Labor Relations Act in the discharge. The Board in its order " . . . decided to affirm the rulings, findings and conclusions of the Administrative Law Judge . . . and it adopts his recommended Order." The Board modified the remedy, but wrote no opinion and made no separate findings or conclusions.

The case reaches us in a somewhat unusual form in that there are no questions of credibility, and no disputed facts. The issues revolve around a letter written by the employee and circulated in the plant, and a written statement read by the plant manager, Steve Silvas, to the employee after the letter had been circulated.

The employee Gould was not discharged for writing the letter in question, but for his refusal to agree to instructions that he would not in the future circulate in the plant material with vulgar and indecent language. The admonition given Gould by the plant manager was specific in that it quoted examples from Gould's letter which were not to be used in the future. He was also instructed not to use language which was defamatory, that would ridicule or result in the "malicious belittlement" of plant personnel, nor to suggest a slowdown, walkout, sit-in, or any other form of action which would interfere with production.

The manager, at a meeting with Gould and the union president, asked Gould to abide by these restrictions in the future. Gould refused to agree to do so, and he was fired. At the meeting there was nothing more than what is described above, except that Gould stated he had a right to do what he was doing. He asked the union president for counsel and he told Gould to abide by the limitations. The plant manager at the meeting with Gould told him as to the vulgar and indecent language:

"While this language may be used in some conversations, we do have employees who probably do not wish to be exposed to such material and may take this distribution home to their family."

The material Gould had distributed was part of his campaign for an office in the union. It was campaign "literature." There had been a slowdown at the plant a few months before. This was during the negotiations for a new three-year contract which had been signed three or four months before this incident.

The campaign for a union office was assumed by the parties to be a protected activity. See NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358, and Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. The Administrative Law Judge considered the whole matter as "union business." He concluded in part:

"What actually happened on April 5 was a confrontation between an employer who overreached in attempting to maintain discipline and an employee who rec-

ognized and protested against the employer's intrusion into the private affairs of a union member who was communicating with other union members regarding union business. That intrusion had several areas of impact. First, Respondent arrogated to itself the right to edit what was essentially an internal union document—using the excuse, which I have previously rejected—that it had the right to control vulgar language, insults directed against management and inflammatory appeals. While that right may exist with regard to other material, it does not exist where the material is legitimate union-related business . . .."

This appears to be an unusual characterization of union business, and led to the erroneous legal position taken by the Administrative Law Judge. He found however that the action of Timpte was not a disparate application of the no-distribution rule as argued by the General Counsel and was not a setup. The rule was not found to be invalid but instead that in its application the "employer overreached in attempting to maintain discipline."

Thus was this use of the profanity, the use of filthy language, and the disparagement of employees, union stewards, and management a protected activity under the decisions? The written material was being circulated in the plant, and we must conclude that the management had the right to direct that such language not be used in the future, and to discharge Gould for insubordination when he refused to so agree.

There was some later distribution in the plant of material again prepared by Gould after his discharge, and again there was the use of filthy language and reference to persons by the use of terms such as chicken

---

The combination of profanity and filthy language in the disparagement of persons at the plant cannot be a protected activity under section 7. One of the older cases sets forth the standard as to such material, and we agree with it. *Maryland Drydock Co. v. NLRB*, 183 F.2d 538 (4th Cir.):

"Upon these facts, the question before us is whether the company may be held guilty of an unfair labor practice because it has forbidden the distribution on its premises of scurrilous and defamatory literature, which holds its officers and supervising officials up to ridicule and contempt, and which has a necessary tendency to disrupt discipline in the plant. We think that this question must be answered in the negative . . .

\* \* \* \* \* \*

"If it is not unfair labor practice to discharge an employee for exhibiting a defiant and insulting attitude towards his foreman, a fortiori it is not an unfair practice to forbid the distribution on company property of literature which is insulting and defiant and which scurrilously lampoons the officers of the company and its supervising employees."

See also *NLRB v. Garner Tool & Die Manufacturing, Inc.*, 493 F.2d 263 (8th Cir.):

"It is not disputed that Hill could have been lawfully discharged because of his S.O.B. comment. We have consistently held that an employer may discharge an employee for good reason, bad reason or no reason at all, so long as the discharge is not motivated by unlawful considerations. [Citing cases]. We stated in *NLRB v. Ace Comb Co., supra* [342 F.2d 841, 847 (8th Cir. 1965)]:

"[O]nce it is determined that disciplinary action is warranted the extent of the action taken is purely within the discretion of the employer, and the Board may not substitute its judgment for that of the employer. 342 F.2d at 847."

See also *NLRB v. Electrical Workers*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195. The matter of abuse of company officials is treated in *NLRB v. Fibers International Corp.*, 439 F.2d 1311 (1st Cir.); *Boaz Spinning Co. v. NLRB*, 395 F.2d 512 (5th Cir.), and *NLRB v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir.). There was no "impulsive behavior" here as referred to in *Boaz Spinning*. We discussed the relationship of protected activities under section 7, and work stoppages in *NLRB v. Empire Gas, Inc.*, 566 F.2d 681 (10th Cir.). After referring to *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, we said:

"It is said that all concerted activities are protected unless unlawful, violent, in breach of contract, or indefensible. See *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 . . ."

We must hold that the activities of Richard Gould in refusing to stop using filthy language in his campaign literature, in refusing to stop the defamation and the disparagement of other employees and company officials was "indefensible," and was not a protected act under section 7. This is a conclusion arrived at as a matter of law, and is reached in the absence of any disputed facts or inferences to be drawn from the facts. The employee used the grievance procedure provided in the contract and his discharge was so considered. The arbitrator there found that Richard Gould was fired for insubordination, and in so doing, the company acted properly.

In view of the conclusion we have reached, we do not have to consider the interaction of the arbitration decision as to the discharge under the union contract, with the *remedy* adopted by the Board. The order of the Board is set aside and enforcement is denied.